GLENN KATON (SBN 281841)
KATON.LAW
385 Grand Avenue, Suite 200
Oakland, CA 94610
Telephone: (510) 463-3350
Email: gkaton@katon.law

*Attorney for Plaintiff*
*SERGIO TAMAYO*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| SERGIO TAMAYO,<br><br>Plaintiff,<br><br>v.<br><br>J. GARCIA, et al.,<br><br>Defendants. | **DECLARATION OF GLENN KATON IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF SHILO BACCA**<br><br>Case No. 5:23-cv-01749-NW |

I, GLENN KATON, declare as follows:

1. I am counsel of record for Plaintiff Sergio Tamayo in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them. I make this declaration in support of Plaintiff's Motion to Exclude the Expert Testimony of Shilo Bacca.

2. Attached as **Exhibit A** is a true and correct copy of the Federal Rule of Civil Procedure 26 expert report of Correctional Captain Shilo Bacca, served on September 25, 2026.

3. Attached as **Exhibit B** is a true and correct copy of the subpoena to produce documents that I caused to be served, under Federal Rule of Civil Procedure 45, on the Custodian of Records of the California Department of Corrections and Rehabilitation (CDCR).

4. Item No. 1 of the subpoena commanded CDCR to produce "All Records of the Incident, including reports, interviews, transcripts, notes, photos, videos, emails, messages, or texts." The subpoena defined "Incident" as the altercation between Defendants and Plaintiff and "Records" as "information stored in any form, within the broadest interpretation of Federal Rule of

Civil Procedure 45."

5. In response to the subpoena, CDCR produced two documents: (a) a 56-page CDCR Incident Report Package for Incident Log No. 35973 (the "ERMS File") and (b) a six-page "Inquiry Report Summary" for Allegation Inquiry Management Section (AIMS) Inquiry Log No. N-AIMS-PBSP-6613-22, Bates-numbered AGO 001 through AGO 006.

6. Capt. Bacca's report lists, in its "Materials Considered" section (Exhibit A at 3–4), the records and data he relied on in forming his opinions. Based on my review of CDCR's production and of the entire record of this case, the following records that Capt. Bacca relied on were not produced by CDCR in response to the subpoena and do not appear anywhere in the record of this case:

a. CDCR-3010 Incident Commander's Review/Critique (dated March 22, 2022)

b. CDCR Form 3011 (Manager's Review – First Level, dated March 25, 2022);

c. CDCR Form 3012 (Manager's Review – Second Level, dated March 28, 2022);

d. CDCR Form 3013-2 (Inmate Interview for Allegation Worksheet, dated July 11, 2022);

e. CDCR Form 3014 (Report of Findings – Inmate Interview, dated March 13, 2023);

f. CDCR Form 3034 (IERC Allegation Review, dated April 4, 2023);

g. CDCR Form 3035 (IERC Review & Further Action Recommendation);

h. CDCR Form 3036 (IERC Critique and Qualitative Evaluation); and

i. the PBSP Post Orders for Facility A on which Capt. Bacca relied (A Security Patrol #1 (261201), A Yard Officer #2 (261239), A Yard Officer #4 (261241), A5 Floor #2 (261289), A8 Floor #1 (261294), and A8 Floor #2 (261295)).

j. and the PBSP AIMS Inquiry Closure Memorandum dated February 23, 2023.

7. CDCR did not serve any written objection to the subpoena identifying these records and did not serve any privilege log or other writing identifying them as withheld.

8. Bacca also relied on the Office of Grievances decisions and the Office of Appeals decisions for Log Nos. 277867 and 281744, and the June 6, 2022 Del Norte County District

Attorney Reject/Detainer Removal Memorandum. CDCR did not produce those documents in response to the subpoena, but Defendants filed copies of them in support of their motion for summary judgment. Plaintiff therefore treats those records as having been produced for purposes of the Motion.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 16, 2026.

/s/ Glenn Katon
Glenn Katon

# EXHIBIT A

ROB BONTA
Attorney General of California
JAY M. GOLDMAN
Supervising Deputy Attorney General
MICHAEL J. QUINN
Deputy Attorney General
State Bar No. 209542
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3611
Fax: (415) 703-5843
E-mail: Michael.Quinn@doj.ca.gov
*Attorneys for Defendants Garcia, Maylin, Romero, Hood, Maldonado, and Wallace*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **SERGIO TAMAYO,**<br><br>Plaintiff,<br><br>**v.**<br><br>**J. GARCIA, et al.,**<br><br>Defendants. | 5:23-cv-01749-NW<br><br>**DEFENDANTS' EXPERT WITNESS DISCLOSURE** |

Defendants Garcia, Maylin, Romero, Hood, Maldonado, and Wallace disclose the expert witness below under Federal Rule of Civil Procedure 26(a)(2)(A). The expert witness may be called at trial to present evidence under Federal Rules of Evidence 702, 703, or 705.

**NON-RETAINED EXPERTS**

The following non-retained expert is expected to be called at trial and testify to the following:

1. **Captain Shilo Bacca**: Captain Bacca is currently employed as a Captain with the California Department of Corrections and Rehabilitation (CDCR) at the Division of Adult Institutions (DAI), Region I Headquarters, where he oversees use of force

reviews at the Departmental Executive Review Committee level. He will testify regarding the use of force by correctional staff during the March 21, 2022 incident. His report is attached as Exhibit "A."

Defendants reserve the right to call as an expert witness any witness designated by any other party to this matter. Defendants further reserve the right to supplement this expert witness disclosure and any of the expert witness reports provided with this disclosure.

Dated: September 25, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JAY M. GOLDMAN
Supervising Deputy Attorney General

*/s/ Michael Quinn*
MICHALE J. QUINN
Deputy Attorney General
*Attorneys for Defendants Garcia, Maylin, Romero, Hood, Maldonado, and Wallace*

SF2024402752
45331064.docx

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION GAVIN NEWSOM, GOVERNOR

**DIVISION OF ADULT INSTITUTIONS**
**P.O. Box 942883**
**Sacramento, CA 94283-0001**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

September 22, 2026

SERGIO TAMAYO (AY9771) v. J. GARCIA, et al.
NO: 3:23-cv-01749-NW
RULE 26 REPORT

I, Correctional Captain Shilo Bacca, submit the following expert report in the matter of Sergio Tamayo (AY9771) v. J. Garcia, et al., No. 3:23-cv-01749-NW, pursuant to Federal Rule of Civil Procedure 26.

**BACKGROUND AND EXPERIENCE**

I am currently employed as a Captain with the California Department of Corrections and Rehabilitation (CDCR) at the Division of Adult Institutions (DAI), Region I Headquarters, where I oversee use of force reviews at the Departmental Executive Review Committee (DERC) level.

My experience includes approximately thirteen (13) years in a supervisory or Office of Internal Affairs capacity, directly responsible for critiquing, training, coordinating, implementing, and supervising immediate and controlled Use of Force options. I have served as a Code 1 Responder, Code 2 Responder, Response Supervisor, and Incident Commander directly responsible for logistical planning, tactical planning, and deployment of force options in over 100 critical incidents. My expertise encompasses chemical agents, hand-held batons, physical strength and holds, less-lethal weapons, and lethal weapons.

I hold multiple instructor certifications, including CDCR Use of Force (since 2015), Entry Operations, Parole Agent Safety and Tactics, and California Peace Officer Standards and Training (POST). I have logged approximately 1,000 combined training hours as a participant or instructor relative to supervisory responsibilities, Use of Force policies, logistical planning, report writing, Incident Commander responsibilities, and investigating allegations of excessive and unnecessary force.

My career progression includes:

- **2007–2013:** Correctional Officer, California Medical Facility.
- **May 2013:** Promoted to Correctional Sergeant, California Medical Facility.

- **November 2013:** Transferred to the Background Investigation Unit as a Correctional Sergeant/Background Investigator.
- **February 2016:** Promoted to Correctional Lieutenant, Mule Creek State Prison.
- **January 2020:** Transferred to the Office of Internal Affairs, Allegation Inquiry Management Section (AIMS), conducting inquiries regarding allegations of unnecessary and/or excessive use of force.
- **April 2020:** Promoted to Special Agent at the Office of Internal Affairs, Central Intake Unit.
- **October 2023:** Promoted to Senior Special Agent at the Office of Internal Affairs, Central Intake Unit.
- **May 2026:** Promoted to Correctional Captain, DAI Region I Headquarters.

My instructor responsibilities include teaching Officers, Sergeants, Lieutenants, and Administrators how to conduct the following tasks when encountering an incarcerated person who is making allegations of excessive or unnecessary force:

- Make incident assessments and process allegations of staff misconduct.
- Determine if allegations are isolated or appear to involve staff acting in concert.
- Determine if the incarcerated person making an allegation is a participant in the Mental Health Services Delivery System (MHSDS) and is able to process claims without staff assistance.
- When allegations of unnecessary and/or excessive force are made, ensure protocols are followed, including the completion of a video interview, a CDCR Form 3014 (Report of Findings), and a medical examination with an accompanying CDCR Form 7219 (Medical Report of Injury or Unusual Occurrence).
- If force was used, determine if the need for force was reasonable and necessary.
- Determine if tactical plans and force deployment fall within policy and procedure for immediate versus controlled force.
- Conduct incident debriefs and prepare report writing assignments.
- Critique reports for clarity, accuracy, and policy compliance.
- Identify inappropriate tactics, uses of excessive force, or uses of unnecessary force.
- Determine how to train staff and correct policy violations.
- Make recommendations to the hiring authority for corrective actions against employees.

I have not authored any publications within the last ten years.

In the past four (4) years, I have testified as an expert at trial or by deposition as follows:

| Case Name & Number | Court / Jurisdiction | Retaining Party | Testimony Type | Date |
|---|---|---|---|---|
| Messiah Messiah v. D. Garcia Lara, et al. | U.S.D.C., Northern District of California (Oakland Div.) | Defendants | Deposition | May 7, 2026 |

| | | | | |
|---|---|---|---|---|
| No. 4:22-cv-02616-JSW | | | | |

I am not receiving separate compensation in this matter beyond my standard salary as an employee of the State of California.

**MATERIALS CONSIDERED**

Based on the following documents or data:

- The first amended complaint (filed 11/6/2023, ECF No. 17).
- CDCR Incident Report Package Log #35973 (dated 3/21/2022).
- CDCR Form 837-A (Crime/Incident Report Summary) & 837-A1 (Supplements).
- CDCR Form 837-B1 & B2 (Involved Inmate and Staff Identification).
- CDCR Form 837-C (Staff Reports) authored by: Lt. S. Burris, Sgt. A. Harris, Sgt. J. Fillippa, Officer J. Garcia, Officer J. Romero, Officer A. Maylin, Officer D. Wallace, Officer K. Hood, Officer S. Maldonado, Officer C. Oviatt, Officer C. Scott, Officer H. Gallegos, Officer M. Contreras Castro, Officer R. Hull, and Officer A. Kauffman.
- CDCR Form 837-C2 (Review Notices and Staff Clarifications).
- CDCR Form 3010 (Incident Commander's Review/Critique, dated 3/22/2022).
- CDCR Form 3011 (Manager's Review – First Level, dated 3/25/2022).
- CDCR Form 3012 (Manager's Review – Second Level, dated 3/28/2022).
- CDCR Form 3013-2 (Inmate Interview for Allegation Worksheet, dated 7/11/2022).
- CDCR Form 3014 (Report of Findings – Inmate Interview, dated 3/13/2023).
- CDCR Form 3034 (IERC Allegation Review, dated 4/4/2023).
- CDCR Form 3035 (IERC Review & Further Action Recommendation, dated 4/6/2022).
- CDCR Form 3036 (IERC Critique and Qualitative Evaluation, dated 4/6/2022).
- CDCR Form 7219 (Medical Report of Injury or Unusual Occurrence) for Incarcerated Person S. Tamayo (AY9771), dated 3/21/2022 and 7/11/2022.
- CDCR Form 7219 (Medical Report of Injury or Unusual Occurrence) for Officer J. Garcia, dated 3/21/2022.
- Evidence Photo Log (Photos AK.001 through AK.011, taken by Officer A. Kauffman on 3/21/2022).
- Rules Violation Report (RVR) Log #7167965 (Battery on a Peace Officer).
- Office of Grievances Decisions (Log #277867 and Log #281744).
- Office of Appeals Final Decisions (Log #277867 and Log #281744).
- Office of Internal Affairs – Allegation Inquiry Management Section (AIMS) Inquiry Report Summary Log #N-AIMS-PBSP-6613-22 (AASTS #20019571).
- PBSP Memorandum regarding AIMS Inquiry Closure (dated 2/23/2023).

- Del Norte County District Attorney Reject/Detainer Removal Memorandum (dated 6/6/2022).
- PBSP Post Orders for Facility A: A Security Patrol #1 (261201), A Yard Officer #2 (261239), A Yard Officer #4 (261241), A5 Floor #2 (261289), A8 Floor #1 (261294), and A8 Floor #2 (261295).
- Deposition Transcripts for Plaintiff Tamayo.
- Declaration of Correctional Officer J. Garcia.
- Declaration of Correctional Officer K. Hood.
- Declaration of Correctional Sergeant [formerly Officer] S. Maldonado.
- Declaration of Correctional Officer A. Maylin.
- Declaration of Correctional Officer J. Romero.
- Declaration of Correctional Officer D. Wallace.
- California Code of Regulations (CCR), Title 15, Section 3268 (Use of Force) and Section 3268.2 (Use of Restraints).
- CDCR Department Operations Manual (DOM), Chapter 5, Article 2, Section 51020 (Use of Force) and Section 51020.6 (Use of Restraints).

**STATEMENT OF FACTS**

1. On March 21, 2022, at approximately 0810 hours, correctional officers used immediate force on Incarcerated Person (IP) Sergio Tamayo (AY9771). The incident was documented within Incident Report Tracking (IRT) Log #35973, in which Correctional Officers J. Garcia, J. Romero, A. Maylin, D. Wallace, K. Hood, and S. Maldonado documented force they used on IP Tamayo.

2. On March 21, 2022, at approximately 0825 hours, Licensed Vocational Nurse (LVN) D. Haislip conducted an immediate medical evaluation of IP Tamayo and documented the findings on a CDCR Form 7219: minor abrasions/scratches to the left cheek, nose, abdomen, left wrist, right knee, and both ankles, with dried blood on the nose and left wrist. No serious bodily injury was sustained. IP Tamayo's statement of circumstances was, "Yah… no."

3. On March 21, 2022, at approximately 0839 hours, LVN D. Haislip conducted a medical evaluation of Officer J. Garcia and documented an abrasion/scratch to his left knee on a CDCR Form 7219. Officer Garcia's statement of circumstances was, "Injury occurred during incident."

4. On March 21, 2022, Investigative Services Unit (ISU) Officer A. Kauffman photographed IP Tamayo's person and documented all injuries on an Evidence Photo Log (Photos AK.001–AK.009), as well as Officer Garcia's knee injury (AK.010–AK.011).

5. On March 21, 2022, at approximately 1406 hours, Officer J. Garcia authored Rules Violation Report (RVR) Log #7167965 charging IP Tamayo with Battery on a Peace Officer (CCR Title 15 § 3005(d)(1)), documenting the following in summary:

   IP Tamayo willfully battered Officer Garcia while Officer Garcia was attempting to gain physical custody of IP Tamayo's person. Tamayo deliberately and intentionally struck Officer Garcia in the abdominal area with his left fist.

   Officer Garcia attempted to process IP Tamayo out to the morning recreational yard. Tamayo appeared agitated and frustrated with the established yard procedures for accessing morning exercise. Officer Garcia directed IP Tamayo to place his hands behind his back after IP Tamayo refused to relinquish his left shoe for a search and failed to comply with the yard program requirements during processing.

   After issuing a clear and direct order for IP Tamayo to turn around and place his hands behind his back, Officer Garcia stepped closer and reached for IP Tamayo's left wrist. IP Tamayo quickly pulled his arm away, breaking Officer Garcia's grasp. Officer Garcia immediately attempted to regain control by reaching again for IP Tamayo's left wrist to overcome his resistance. Before Officer Garcia could do so, IP Tamayo aggressively thrust his left fist forward, striking Officer Garcia in the abdominal area. Responding staff utilized physical force to secure IP Tamayo and bring the incident under control.

   The RVR was postponed, pending referral to the Del Norte County District Attorney's Office for felony criminal prosecution consideration.

6. On March 21, 2022, compilation of IRT Log #35973 was initiated, which included the following in summary:

   IP Tamayo was being processed for Facility A morning yard. During the processing procedure, Officer Garcia directed IP Tamayo to hand him his shoes for a contraband search. IP Tamayo kicked one shoe toward Officer Garcia. Officer Garcia again instructed IP Tamayo to hand him his shoes, at which time IP Tamayo became agitated and refused to comply. Officer Garcia then ordered IP Tamayo to turn around and submit to handcuffs. As Officer Garcia placed his hand on IP Tamayo's arm to initiate application of restraints, IP Tamayo immediately punched Officer Garcia in the abdomen/chest area with a closed fist. Responding staff utilized physical force to bring IP Tamayo to the ground and stop the assault.

   IP Tamayo did not suffer Serious Bodily Injury, nor did he allege any staff misconduct. Sergeant J. Fillipa interviewed randomly selected incarcerated persons regarding the battery; no ongoing threat to incarcerated persons or officers was discovered.

IP Tamayo was documented as sustaining an abrasion/scratch on his left cheek, abdomen, nose, left wrist, right knee, and left and right ankles. There was dried blood on his nose and left wrist; his injuries were treated on scene.

Officer Garcia was documented as sustaining minor injury to the legs/feet; his injury was treated on scene.

**Sergeant A. Harris documented the following in summary:** Sergeant Harris observed IP Tamayo resist staff during morning yard processing. IP Tamayo pulled away from Officer Garcia and, during the struggle, punched him in the stomach. Staff initiated a Code 1 response, ordered the yard down, and used controlled physical force to bring IP Tamayo to the ground as he continued to resist by thrashing and kicking. Multiple officers assisted in gaining control, applying wrist and leg restraints, and conducting a contraband search, which was negative. IP Tamayo sustained only minor superficial scratches, and Officer Garcia reported a scraped knee.

**ISU Officer A. Kauffman documented the following in summary:** ISU Officer Kauffman responded to a Facility A incident in which IP Tamayo had battered Officer J. Garcia, prompting the use of force. Kauffman identified IP Tamayo, documented his injuries through photographs, and later photographed Officer Garcia's minor knee injury. Surveillance cameras did not capture the battery. All photographs and documentation were secured as evidence for future investigative or legal purposes.

**Officer J. Garcia documented the following in summary:** Officer Garcia attempted to process IP Tamayo for morning yard release. IP Tamayo became increasingly agitated, refused to comply with search procedures, and kicked a boot toward Officer Garcia. When ordered to submit to restraints, IP Tamayo pulled away and then punched Officer Garcia in the abdomen, prompting an immediate use of force. Officer Garcia took IP Tamayo to the ground as IP Tamayo continued to resist by thrashing. After being restrained, IP Tamayo was escorted from the yard, and Officer Garcia later received a medical evaluation for minor injury.

**Officer M. Contreras-Castro documented the following in summary:** Officer Contreras-Castro observed IP Tamayo refusing to follow Officer Garcia's orders during morning yard release and aggressively tossing a boot toward Officer Garcia. As IP Tamayo advanced toward Garcia, Officer Contreras-Castro saw Officer Garcia attempt to gain control of IP Tamayo's wrist. His view was then obstructed by other incarcerated persons moving through the area, but he heard staff give "get down" commands and assisted by directing uninvolved individuals to prone out. He could not see or assess the actions of other responding staff.

**Officer C. Oviatt documented the following in summary:** Officer Oviatt was conducting morning yard release when he heard staff giving "stop resisting" commands. He directed the IP he was searching to prone out and observed staff

already restraining Tamayo. Oviatt secured other incarcerated persons in the area, retrieved leg restraints when requested, and applied them to Tamayo, who was still attempting to kick. He then resumed providing security for the yard.

**Officer J. Romero documented the following in summary:** Officer Romero observed IP Tamayo become increasingly agitated and noncompliant during a search, ultimately striking Officer Garcia in the abdomen. Officer Romero intervened immediately, ordering IP Tamayo to the ground and using immediate physical force to restrain him as IP Tamayo continued resisting. Romero applied wrist restraints and maintained control until leg restraints were applied. After IP Tamayo was secured, Officer Romero disengaged. He did not observe any additional force beyond what he personally applied.

**Officer A. Maylin documented the following in summary:** Officer Maylin observed IP Tamayo become increasingly agitated during Cell Sense screening and later during a clothed body search. IP Tamayo kicked a boot toward Officer Garcia, refused multiple directives, and then resisted attempts to apply restraints. When IP Tamayo advanced toward Officer Garcia in a threatening manner and used his arm in a pushing or striking motion, Officer Maylin intervened, assisting in taking IP Tamayo to the ground and restraining him as IP Tamayo continued to thrash and resist. IP Tamayo was ultimately secured in mechanical restraints, and Officer Maylin helped stabilize the area and manage uninvolved incarcerated persons.

**Officer D. Wallace documented the following in summary:** Officer Wallace observed IP Tamayo resisting Officer Garcia during a clothed body search and immediately responded. After IP Tamayo was taken to the ground by other staff, Officer Wallace gained control of IP Tamayo's right arm despite continued resistance, enabling wrist restraints to be applied. IP Tamayo remained resistive until leg restraints were secured, after which he complied. Officer Wallace conducted a contraband search with negative results, and IP Tamayo was escorted from the yard.

**Officer K. Hood documented the following in summary:** Officer Hood responded to a disturbance during morning yard release and found IP Tamayo on the ground resisting staff by thrashing his upper body and legs. Officer Hood applied downward pressure to IP Tamayo's shoulder area to assist in overcoming his resistance. IP Tamayo continued to struggle until wrist and leg restraints were applied, after which he became compliant. Hood then disengaged and returned to duty.

**Sergeant J. Fillippa documented the following in summary:** Sergeant Fillippa responded to a disturbance on Facility A and observed staff restraining IP Tamayo while the yard was already secured in a prone position. He ensured uninvolved individuals were redirected for safety, noted minor injuries to IP Tamayo and Officer Garcia, and confirmed the yard was Code 4. Sergeant Fillippa then conducted

interviews with two incarcerated persons and with IP Tamayo, determining the incident was isolated and that no active threats toward staff or others existed.

**Officer S. Maldonado documented the following in summary:** Officer Maldonado observed staff struggling to restrain IP Tamayo during morning yard release. IP Tamayo was actively kicking while on the ground, creating a safety risk. Maldonado applied downward pressure to IP Tamayo's ankles to stop the kicking, and once leg restraints were applied by Officer Oviatt, IP Tamayo ceased resisting. Officer Maldonado then disengaged.

7. On March 21, 2022, the Incident Commander, Lieutenant S. Burris, completed an Incident Commander's Review/Critique (CDCR Form 3010), wherein he determined the involved staff's actions prior to, during, and following the use of force were compliant with the Use of Force policies, procedures, and training.

8. On March 25, 2022, Captain (A) K. Royal completed a Manager's Review - First Level (CDCR Form 3011), wherein he determined the involved staff's actions prior to, during, and following the use of force were compliant with the Use of Force policies, procedures, and training.

9. On March 28, 2022, Associate Warden K. Osborne completed a Manager's Review - Second Level (CDCR Form 3012), wherein he determined the involved staff's actions prior to, during, and following the use of force were compliant with the Use of Force policies, procedures, and training.

10. On June 3, 2022, the Del Norte County District Attorney's Office declined criminal prosecution, referring the matter back to PBSP for administrative adjudication.

11. On June 23, 2022, Investigative Employee Officer L. Cambria authored a Rules Violation Report (RVR) Supplemental – Investigative Report regarding RVR Log #7167965, wherein he documented the following in summary:

    Officer Cambria was assigned as the Investigative Employee for the RVR involving IP Tamayo for Battery on a Peace Officer. Officer Cambria interviewed IP Tamayo after advising him of his rights and confirming effective communication. The RVR process was delayed pending a District Attorney review. IP Tamayo provided questions for several incarcerated witnesses, most of whom declined to comment, and one stated he saw no assault. IP Tamayo also submitted questions for staff witnesses; however, the Senior Hearing Officer deemed them irrelevant because written staff reports had already been provided. Officer Cambria completed the investigation on June 23, 2022, after reviewing all available information and documenting witness requests.

12. On June 28, 2022, Senior Hearing Officer, Lieutenant J. Frisk, adjudicated RVR Log #7167965 and found IP Tamayo "Guilty as Charged" for violation of CCR Title 15,

Section 3005(d)(1) – Battery on a Peace Officer. On July 5, 2022, Chief Disciplinary Officer, Associate Warden (A) L. Deters, affirmed the finding.

13. On July 11, 2022, PBSP Grievance Office received Grievance Log #277867 (dated July 11, 2022), wherein IP Tamayo alleged that on March 21, 2022, correctional officers used excessive force, specifying he was "slammed" and "choked." IP Tamayo documented that, "At no time did I [IP Tamayo] ever resist or fail to comply with staff."

    ***Reviewer's Note:*** *There is no indication IP Tamayo made any allegation of unnecessary and/or excessive force or choking related to IRT Log #35973 prior to July 11, 2022.*

14. On July 11, 2022, following receipt of Grievance Log #277867, Lieutenant J. Reynoso and Sergeant M. Miller conducted a video-recorded interview of Tamayo pursuant to DOM § 51020.17.3. An updated CDCR Form 7219 completed by Psychiatric Technician S. Whiteman noted no visible injuries and subjective complaints of right shoulder pain.

    IP Tamayo alleged that after handing his boots to an officer, the officer pushed IP Tamayo to the ground, another officer jumped on IP Tamayo's back, and an unidentified officer choked IP Tamayo.

15. On July 19, 2022, PBSP Grievance Office received Grievance Log #281744 (dated July 18, 2022), wherein IP Tamayo alleged Investigative Employee, Officer L. Cambria, lied in his authored report regarding RVR Log # 7167965 when he documented that all of IP Tamayo's requested witnesses except IP Martinez (BM9783) had no comment or were no longer housed within the same building.

16. On August 19, 2022, the Office of Grievances documented their findings regarding Grievance Log #277867. IP Tamayo's allegation that staff used excessive or unnecessary force was determined to be an Allegation of Staff Misconduct. IP Tamayo's request regarding his Rules Violation Report was denied.

    ***Reviewer's Note:*** *As an Allegation of Staff Misconduct, IP Tamayo's allegation that staff used excessive or unnecessary force was forwarded to the Allegation Inquiry Management Section (AIMS) for inquiry.*

    On September 12, 2022, IP Tamayo appealed the Office of Grievances' findings. On November 12, 2022, the Office of Appeals upheld the Office of Grievances' findings.

17. On August 30, 2022, the Office of Grievances documented their findings regarding Grievance Log #281744. IP Tamayo alleged he was not afforded due process during the course of his hearing regarding RVR Log #7167965. Tamayo's request regarding his Rules Violation Report was denied.

On September 19, 2022, IP Tamayo appealed the Office of Grievances' findings. On November 19, 2022, the Office of Appeals upheld the Office of Grievances' findings.

18. On December 27, 2022, AIMS completed Inquiry Report #N-AIMS-PBSP-6613-22 regarding IP Tamayo's allegations. The inquiry determined that staff reports and witness testimonies were consistent, and no policy violations occurred.

19. On March 13, 2023, Lieutenant J. Reynoso completed a Report of Findings – Inmate Interview, wherein he documented the following in summary:

On March 21, 2022, a Use of Force incident involving IP Tamayo occurred at PBSP, Facility A. The incident was assigned Incident Report Tracking Log #35973. According to IP Tamayo's interview conducted on July 11, 2022, by Lieutenant Reynoso, the IP Tamayo reported that staff slammed him to the ground and multiple officers jumped on his back. IP Tamayo further stated that officers placed their knees on his neck, causing him to choke

Five incarcerated witnesses housed near IP Tamayo at the time were identified for interview. Four incarcerated witnesses either refused to participate or stated they did not observe the event. One Incarcerated witness reported hearing officers order IP Tamayo to "get down" and observed staff punching IP Tamayo.

Lieutenant Reynoso examined available evidence, including staff reports, photographs, use-of-force video, and medical findings documented on CDCR Form 7219. The CDCR Form 7219 dated March 21, 2022, noted abrasions on IP Tamayo's face, wrists, knees, and ankles, along with dried blood on the nose and left wrist. A subsequent CDCR Form 7219 dated July 11, 2022, documented no injuries.

The investigative conclusion found that the injury pattern was consistent with the reported force. No additional discrepancies were identified. The custody supervisor, facility captain, and associate warden each recommended no further action. Their reviews cited consistency between employee witness testimony and staff reports, leading to closure of the allegation without additional administrative follow-up.

20. On April 4, 2023, the Institutional Executive Review Committee (IERC) and Chief Deputy Warden R. Bell approved the Allegation Review (Form 3034), formally finding all staff actions compliant with policy and recommending no further action.

21. On November 13, 2023, IP Tamayo filed an Amended Complaint, dated November 1, 2023, wherein he documented the following in summary:

On March 21, 2022, during a recreation yard release, IP Tamayo was subjected to multiple metal-detector passes and a subsequent clothed body search conducted by

Officer J. Garcia. While IP Tamayo was complying with an instruction to remove his footwear, Officer Garcia activated a personal alarm and forcibly took IP Tamayo to the ground without provocation.

While prone and non-resistant, several officers, including Garcia, Romero, Maylin, Hood, Maldonado, and Wallace, struck him repeatedly, applied knee pressure to his neck, and placed him in a chokehold that impeded his breathing.

Following the incident, Officer Garcia generated a false Rules Violation Report claiming IP Tamayo had assaulted staff. Additionally, ISU Officer A. Kauffman withheld surveillance footage, and Senior Hearing Officer, Lieutenant J. Frisk, denied witness testimony, video evidence, and exculpatory reports before finding IP Tamayo guilty and imposing a six-month segregation term with loss of privileges.

22. On April 16, 2025, IP Tamayo participated in a deposition, wherein he stated the following in summary:

While IP Tamayo was heading to morning yard release, Officer Maylin directed him to walk through the metal detector multiple times. Although the detector never beeped, Officer Maylin required three to four passes. IP Tamayo felt “annoyed” but not angry during this process.

After IP Tamayo cleared the detector, Officer Garcia pulled IP Tamayo aside for an additional pat-down [clothed body search], which IP Tamayo described as rough. Garcia then attempted to yank IP Tamayo’s ID from his hand. As IP Tamayo began walking toward the yard, Officer Garcia called him back and ordered him to remove his boots. IP Tamayo complied and handed a boot directly to Officer Garcia; IP Tamayo denied officers’ claims that he kicked it.

Officer Garcia suddenly grabbed IP Tamayo, directed him toward the exit path, and forcibly threw him to the ground. Officers Garcia, Romero, Maylin, Maldonado, and Wallace, converged on him, jumping onto his back, punching him, and aggressively restraining him.

A knee was pressed against IP Tamayo’s neck in a manner he likened to the “George Floyd” incident, restricting his ability to breathe. IP Tamayo stated, “I can’t breathe,” but officers did not stop applying pressure.

Due to his significant visual impairment, IP Tamayo could not visually identify who struck him, but felt blows to his head, ribs, and back. Some identifications were based on who he believed was present rather than direct observation.

IP Tamayo was ultimately restrained with handcuffs and leg restraints. IP Tamayo reported he suffered scrapes to his face and legs from the takedown, blows to his head and ribs, and difficulty breathing during restraint.

Following the incident, IP Tamayo was photographed and medically evaluated on a CDCR Form 7219; however, some injuries, including bumps on his head and throat pain, were not documented in the photographs or medical notes.

23. On June 23, 2025, declarations of Officers J. Garcia, K. Hood, A. Maylin, D. Wallace, J. Romero, and Sergeant [formerly Officer] S. Maldonado were filed.

**Officer Garcia declared the following in summary:** While monitoring morning yard release procedures on March 21, 2022, IP Tamayo displayed escalating agitation during routine contraband-prevention searches. IP Tamayo initially complied with instructions to clear electronic detection devices but became increasingly confrontational during a subsequent pat-down and boot inspection.

IP Tamayo abruptly removed his ID, resisted search instructions, and at one point kicked a boot toward Officer Garcia, requiring Officer Garcia to step back to avoid being struck. After continued noncompliance, Officer Garcia issued a direct order and attempted to place IP Tamayo in custody. IP Tamayo physically resisted and delivered a punch to Officer Garcia's abdominal area, prompting Officer Garcia to order IP Tamayo to the ground and employ trained control techniques to subdue him.

During the takedown, Officer Garcia lost control of IP Tamayo's arm and landed with his chest on IP Tamayo's shoulder area. While restrained on the ground, IP Tamayo stated twice that he could not breathe; however, there was no obstruction to IP Tamayo's airway and he continued talking and breathing. Officer Garcia sustained a knee abrasion during the incident.

Officer Garcia had no notable prior or subsequent interactions with IP Tamayo and denied any discrimination or retaliation. Officer Garcia maintained that the force used was reasonable and directly responsive to IP Tamayo's active physical resistance and actions that, in Officer Garcia's assessment, posed a risk of injury to staff.

**Officer Hood declared the following in summary:** While assisting with the morning recreational yard release, Officer Hood observed a commotion in the pat-down area after hearing an officer issue an order. Upon responding, Officer Hood saw Officers Garcia, Wallace, and Maylin ordering IP Tamayo to stop resisting and comply with handcuffing procedures. IP Tamayo was already on the ground in a prone position and continued to thrash his body and legs from side to side as officers applied downward pressure to gain control.

Officer Hood joined the effort by applying additional downward pressure to stabilize IP Tamayo; however, IP Tamayo continued resisting until Officer Romero successfully secured him in handcuffs. Officer Hood's involvement ended once

restraints were applied.

Officer Hood had no notable prior or subsequent interactions with IP Tamayo and denied any discrimination or retaliation related to disability status. Officer Hood maintained that her use of force was reasonable, limited, and applied only after IP Tamayo became physically resistive and made physical contact with staff, which Officer Hood believed posed a safety risk.

**Officer Maylin declared the following in summary:** IP Tamayo exhibited increasing agitation during routine morning yard-release screening procedures. IP Tamayo failed to clear the Cell Sense Towers three times, triggering both audible and visual alerts that suggested the presence of metal. Officer Maylin instructed IP Tamayo to remove permissible metal items, after which IP Tamayo successfully cleared the scanner but remained visibly agitated.

Upon being directed by Officer Garcia to undergo a clothed body search, IP Tamayo initially complied but soon stepped away from Officer Garcia, showing elevated agitation. When Officer Garcia ordered IP Tamayo to remove his boots for inspection, IP Tamayo launched a boot toward Officer Garcia using his toes, prompting repeated orders to pick up the boot. IP Tamayo refused before ultimately complying.

Following the boot inspection, IP Tamayo refused to remove his second boot and verbally objected. Officer Garcia then ordered IP Tamayo to "cuff up." IP Tamayo resisted by pulling away and making a forward striking motion toward Officer Garcia's torso, causing Officer Maylin to shout "Don't resist!" and intervene due to safety concerns.

Maylin attempted to gain control by grabbing IP Tamayo's arm and shoulder, but IP Tamayo violently broke free. After a "get down" command went unheeded, Officer Maylin applied downward pressure to bring IP Tamayo to the ground, assisting Officer Garcia in placing IP Tamayo in a prone position. Once on the ground, IP Tamayo continued thrashing and flexing his torso, requiring additional officers to assist until he was secured in handcuffs. Officer Maylin maintained pressure on IP Tamayo's lower back and controlled his right wrist until restraints were applied.

Maylin had no significant prior or subsequent interactions with IP Tamayo and denied any discriminatory or retaliatory conduct. Officer Maylin asserted that only reasonable force was used and only after IP Tamayo became actively physically resistive and made physical contact with staff, posing a risk of injury.

**Officer Wallace declared the following in summary:** During morning recreational yard release, Officer Wallace observed IP Tamayo resisting and pulling away from Officer Garcia as Officer Garcia conducted a clothed body search. Officer Wallace

responded immediately, arriving as other staff brought IP Tamayo to the ground.

Positioning himself on IP Tamayo's right side, Officer Wallace attempted to control IP Tamayo's right arm by securing the wrist and guiding it behind IP Tamayo's back. IP Tamayo continued resisting by pulling his arm away, requiring Officer Wallace to use both hands (one on the wrist and one on the upper arm) to gain control. Once the arm was positioned behind IP Tamayo's back, Officer Romero was able to apply handcuffs. Even after restraints were applied, IP Tamayo continued pulling his arm away from Officer Wallace's grip until leg restraints were applied, at which point IP Tamayo's resistance ceased.

Officer Wallace completed a clothed body search with negative results and then returned to his assigned duties. Officer Wallace had no meaningful prior or subsequent interactions with IP Tamayo and denied any discrimination or retaliation related to disability status. Officer Wallace maintains that only reasonable force was used and only after IP Tamayo became actively physically resistive and made contact with staff, presenting a safety concern.

**Officer Romero declared the following in summary:** While monitoring the morning yard release, Officer Romero observed IP Tamayo becoming agitated during a contraband search conducted by Officer Garcia. IP Tamayo displayed a defensive posture when instructed to remove and surrender his boots, behavior Officer Romero interpreted as potentially escalating into a threat based on his training and experience.

When Officer Garcia attempted to take control of IP Tamayo's left wrist to apply restraints, IP Tamayo pulled away, stepped forward, and struck Officer Garcia in the abdomen with a closed fist. Officer Romero identified this strike as a significant safety risk to staff. In response, Officer Romero ordered IP Tamayo to "get down," grabbed IP Tamayo's right forearm, and used downward force to bring IP Tamayo to the ground.

Once prone, IP Tamayo continued resisting by pulling his arms away and making erratic movements. To gain control, Officer Romero applied downward pressure with his right knee to IP Tamayo's right hamstring while controlling IP Tamayo's right forearm with his hand. Officer Romero successfully applied handcuffs and maintained pressure until leg restraints were secured.

Officer Romero had no significant interactions with IP Tamayo before or after the incident and denied any discriminatory or retaliatory conduct. Officer Romero asserted that the force used was reasonable and applied only after IP Tamayo became actively physically resistive and struck an officer, creating a risk of injury.

**Sergeant [formerly Officer] Maldonado declared the following in summary:** While observing the morning yard release, Sergeant Maldonado heard an officer

issue a "Get down!" order. Sergeant Maldonado scanned the yard and observed multiple officers attempting to gain control of IP Tamayo.

Sergeant Maldonado did not witness the initial tactics used but saw that IP Tamayo's legs were unrestrained and that IP Tamayo was attempting to kick the officer positioned on his back. To prevent injury to staff, Sergeant Maldonado secured IP Tamayo's legs by holding both ankles, left with his left hand and right with his right hand, until leg restraints were applied. Sergeant Maldonado had no other involvement in the incident.

Although IP Tamayo was housed in Sergeant Maldonado's unit and he interacted with IP Tamayo daily, he recalled no prior negative interactions. Sergeant Maldonado denied any discrimination or retaliation related to disability status and asserted that he used only the amount of force necessary to stop IP Tamayo's kicking and prevent injury.

## CDCR USE OF FORCE POLICY

The CDCR Use of Force policy as outlined in California Code of Regulations, Title 15, section 3268 contains the following definitions:

- **Reasonable Force:** The force that an objective, trained, and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, prevent escape, or gain compliance with a lawful order.
- **Immediate Use of Force:** The force used to respond without delay to a situation or circumstance that constitutes an imminent threat to institution or facility security or the safety of persons. Immediate force may be necessary to subdue an attacker, overcome resistance, effect arrest and custody, or prevent escape. If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used.
- **Non-conventional Force:** Force that utilizes techniques or instruments that are not specifically authorized in policy, procedures, or training. Depending on the circumstances, non-conventional force can be necessary and reasonable; it can also be unnecessary or excessive.
- **Imminent Threat:** Any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution and requires immediate action to stop the threat. Some examples include, but are not limited to, an attempt to escape, ongoing physical harm, or active physical resistance.
- **Unnecessary Force:** The use of force when none is required or appropriate.
- **Excessive Force:** The use of more force than is objectively reasonable to accomplish a lawful purpose.
- **Serious Bodily Injury:** A serious impairment of physical condition, including, but not limited to the following: loss of consciousness; concussion; bone fracture;

protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.

- **Totality of Circumstances:** All facts known to the peace officer at the time, including the conduct of the officer and the subject leading to the use of force.

**USE OF FORCE OPTIONS**

Officers are trained to isolate, contain, and control any incident, which involves violence or the potential for violence. Officers are provided and trained with tools to respond to incidents and stop violence in the safest manner possible. Correctional staff make rapid decisions on the best method possible with the most appropriate tool they have to stop the violence. Correctional staff have a variety of tools depending on what their assignments are. For example, a floor Officer assigned to cover a building's dayroom area would generally have an Oleoresin Capsicum (O/C) pepper spray deployment device, an expandable baton, and a chemical agent grenade. An Observation Tower Officer would generally have a Ruger Mini 14 rifle and a 40 mm launcher.

Depending on the type of incident, a Correctional Staff member would decide which force option would be best to stop the incident. Typically, incidents can be broken down into categories. For example, incarcerated persons fighting with no immediate threat of death or great bodily injury, based on the terrain, would more than likely be stopped through the use of verbal orders, chemical agents, physical force, use of the expandable baton, or the 40 mm launcher.

Use of Force options do not have to be utilized in any particular sequence but should be the force options staff reasonably believes are sufficient. Whenever possible, verbal persuasion or orders shall be issued prior to resorting to force and are required to be provided before controlled force is used.

DOM section 51020.6 states in part; The un-resisted searching or escorting of a person and the un-resisted application of authorized restraint equipment is not a use of force.

Use of force options include but are not limited to: (1) chemical agents; (2) hand-held batons; (3) physical strength and holds; (4) less-lethal weapons; and (5) lethal weapons.

**SUMMARY OF OPINIONS**

It is my professional opinion that the defendants did not violate the CDCR Use of Force policy on March 21, 2022; specifically, none of the involved officers used unnecessary or excessive force.

Incarcerated Person Tamayo's noncompliance during search procedures, aggressive kicking of footwear at Officer Garcia, refusal to submit to restraints, and battery against Officer Garcia by striking him in the abdomen with a closed fist constituted an imminent threat to staff safety and yard security. Staff were fully authorized under CCR Title 15,

Section 3268 to employ immediate physical force to subdue the attacker, overcome active physical resistance, effect custody, and gain compliance with multiple lawful orders, thereby regaining institutional control.

The force deployed by staff was strictly limited to physical strength, body weight, and holds. No intermediate weapons (chemical agents, batons, or 40mm impact munitions) or lethal options were deployed. Force was applied only for the duration necessary to overcome IP Tamayo's continuous physical thrashing and kicking and ceased immediately once mechanical wrist and leg restraints were secured.

**Analysis of Individual Officer Actions:**

- **Correctional Officer J. Garcia:** Officer Garcia's use of force was necessary and objectively reasonable. Faced with an active, close-quarters physical strike to his abdomen, Officer Garcia utilized immediate physical force, employing a trained body hold and controlled takedown to bring IP Tamayo to the ground, followed by downward pressure on IP Tamayo's upper back to control thrashing. His actions were directly tailored to neutralize an active physical assault and effect custody.

- **Correctional Officer J. Romero:** Officer Romero's use of force was necessary and objectively reasonable. Observing IP Tamayo strike Officer Garcia, Officer Romero controlled Tamayo's right forearm during the descent, used knee pressure across Tamayo's hamstring/lower extremity to control hip movement and prevent kicking, and applied handcuffs.

- **Correctional Officer A. Maylin:** Officer Maylin's use of force was necessary and objectively reasonable. After witnessing Tamayo strike Officer Garcia, Officer Maylin assisted in guiding Tamayo to the ground and applied physical body weight to Tamayo's lower back and shoulder area to overcome active torso flexing until mechanical restraints were applied.

- **Correctional Officer D. Wallace**: Officer Wallace's use of force was necessary and objectively reasonable. Officer Wallace secured Tamayo's right arm and triceps, overcoming IP Tamayo's active resistance, successfully positioning the arm behind IP Tamayo's back to facilitate the application of handcuffs by Officer Romero.

- **Correctional Officer K. Hood:** Officer Hood's use of force was necessary and objectively reasonable. Officer Hood applied downward pressure to Tamayo's right shoulder girdle to stabilize IP Tamayo's upper torso while IP Tamayo was actively thrashing.

- **Correctional Officer S. Maldonado:** Officer Maldonado's use of force was necessary and objectively reasonable. Observing Tamayo kicking his unrestrained legs toward staff holding his upper body, Officer Maldonado secured both of

Tamayo's ankles to the ground until mechanical leg restraints were applied.

- **Correctional Officer C. Oviatt:** Officer Oviatt's application of mechanical leg restraints to a controlled subject constituted an authorized restraint application pursuant to CCR Title 15, Section 3268.2.

- **Correctional Officers C. Scott and H. Gallegos:** Officers Scott and Gallegos did not use reportable force; their role was limited to escorting IP Tamayo following complete mechanical restraint.

- **Lieutenant S. Burris:** As Incident Commander, Lieutenant Burris did not use force. He carried out appropriate post-incident duties, ensuring the yard was secure, medical examinations were initiated promptly, evidence photos were taken, and administrative critiques were completed pursuant to policy.

**Rebuttal of Choking and Positional Asphyxia Claims:**

IP Tamayo’s allegations that staff choked him, restricted his breathing with a knee to the neck, or jumped on him maliciously are wholly unsupported by the record. Downward body pressure was directed exclusively to the shoulder blades, upper back, and extremities to control active resisting and kicking. Staff applied no neck restraints, chokeholds, or laryngeal compression.

Furthermore, IP Tamayo was actively speaking and yelling during the ground restraint. Vocalization conclusively demonstrates that the airway was open and patent.

**Correlation of Medical Evidence:**

The medical findings documented by LVN D. Haislip on the CDCR Form 7219 within fifteen minutes of the incident (superficial abrasions to the cheek, nose, knees, ankles, and wrist, with minor dried blood) and the accompanying photo log are consistent with a controlled physical takedown and ground stabilization on a concrete yard surface.

These documented minor injuries do not support IP Tamayo’s claims of being choked, stomped, or subjected to closed fist strikes by multiple officers. IP Tamayo presented zero soft-tissue neck swelling, petechiae, laryngeal trauma, bone fractures, concussions, or loss of consciousness, and required no sutures or acute medical interventions.

My opinions in this matter are based upon my review of the documents, declarations, and evidence listed above, which I have relied upon as being true and correct copies of the originals. The form and content of these records are consistent with my over nineteen years of experience in correctional operations and Use of Force evaluations.

Based on my knowledge, specialized training, and professional experience, all involved correctional staff acted in full accordance with California Code of Regulations Title 15, Section 3268, Department Operations Manual, Section 51020, and constitutional standards. The force used was applied in good faith to restore discipline and order, was objectively reasonable and necessary to overcome active assaultive resistance and was immediately de-escalated upon gaining compliance and securing restraints.

I would reach the same opinions if the above facts were proposed to me as a hypothetical.

Respectfully submitted,

DocuSigned by:
Shilo Bacca
C611620D69F44D1...

SHILO BACCA
CAPTAIN
California Department of Corrections and Rehabilitation
Division of Adult Institutions
Region I Headquarters

# EXHIBIT B

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

SERGIO TAMAYO
*Plaintiff*
v.
J. GARCÍA, et al.
*Defendant*

Civil Action No. 5:23-cv-01749-NW

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: California Department of Corrections & Rehabilitation (Custodian of Records), 1515 S Street, Suite 101N, Sacramento, CA 95811

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See EXHIBIT A

| Place: Mirador Law, 4750 Willow Road, Ste. 275<br>Pleasanton, CA 94588 | Date and Time:<br>09/01/2026 10:00 am |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/06/2026

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

[signature]

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Sergio Tamayo, who issues or requests this subpoena, are:

Glenn Katon, Katon.Law, 385 Grand Avenue, Suite 200, Oakland, CA 94610; (510) 463-3350; gkaton@katon.law

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 5:23-cv-01749-NW

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ______________ .

❐ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________________________________ on *(date)* ______________ ; or

❐ I returned the subpoena unexecuted because: ______________________________

______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

Print Save As... Add Attachment Reset

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

Subpoena in *Tamayo v. Garcia*, Case No. 5:23-cv-01749-NW (N.D. Cal.)

"Defendants" means CDCR Officers J. GARCIA, J. ROMERO, S. MALDONADO, A. MAYLIN, D. WALLACE, and K. HOOD, the defendants in the above-named case.

"Incident" means the altercation between Sergio Tamayo (AY9771) and CDCR Officers at Pelican Bay State Prison (Facility A, Building 5) on March 21, 2022.

"Records" means information stored in any form, within the broadest interpretation of Federal Rule of Civil Procedure 45(a)(1)(D).

1. All Records of the Incident, including reports, interviews, transcripts, notes, photos, videos, emails, messages, or texts.

2. All Records of policies that applied to the use of force by Defendants at the time of the Incident, including regulations, Operational Procedures, memoranda, bulletins, and guidance.

3. For video cameras whose field of view included the Incident, all video of the Incident including 15 minutes before the Incident, and 15 minutes after.

4. For video cameras whose field of view included the Incident, all Records showing the location of those cameras.

5. For video cameras whose field of view included the Incident but did not capture the Incident, all Records showing why they did not capture the Incident, such as maintenance Records, Records documenting malfunction, or Records documenting the loss or destruction of video.